519 F.2d 430
 Nancy Anne SPANGLER, by her father and next friend, James E.
Spangler, Jr., et al., Plaintiffs-Appellees,
and
United States of America, Plaintiff-Intervenor-Appellee,
v.
PASADENA CITY BOARD OF EDUCATION et al., Defendants-Appellants.
 No. 74-2116.
 United States Court of Appeals,
Ninth Circuit.
 May 5, 1975.
 
 Lee G. Paul (argued), Los Angeles, Cal., for defendants-appellants.
 Brian K. Landsberg, Dept. of Justice (argued), Washington, D. C., and Fred Okrand (argued), Los Angeles, Cal., for appellees.
 OPINION
 Before CHAMBERS, ELY and WALLACE, Circuit Judges.
 ELY, Circuit Judge:
 
 
 1
 The appellants, Pasadena (California) City Board of Education (hereafter Board) and some of its officials, individually, appeal from an Order of the District Court, reported at 375 F.Supp. 1304 (C.D.Cal.1974), which denied the Board's motions for: (1) relief from the District Court's Order of January 23, 1970, requiring the desegregation of the Pasadena public schools and the District Court's Order of March 10, 1970, which approved the then Board's Pasadena Plan for desegregation; (2) dissolution of the District Court's injunction requiring that there be no school in the School District with a majority of its enrollment composed of students of a minority race; (3) termination of the District Court's continuing jurisdiction of the case; and (4) alternatively, for permission to modify the Pasadena Plan ordered by the court by substituting a so-called Alternative Plan.[1]
 
 
 2
 It is important at the outset to underscore the narrow ambit of our review, a constriction resulting from the procedural posture in which this appeal is before our court. Neither the Pasadena Plan itself nor the District Court's January 23, 1970, and March 10, 1970, Orders directing the implementation of the plan are here on direct appeal. Nor are we concerned with the correctness of the District Court's original decision in Spangler v. Pasadena City Board of Education, 311 F.Supp. 501 (C.D.Cal.1970), and the conclusions drawn therein. The only question before us now is whether the District Court erred in its determination, in denying appellants' 1974 motions, that events and circumstances occurring and existing in Pasadena since the Pasadena Plan was ordered implemented do not justify relief from the January 23, 1970, Decree, relinquishment of the court's continuing jurisdiction over the Board, or the substitution of a substantial alteration of the original Pasadena Plan.
 
 
 3
 I. Procedural History and Factual Background.
 
 
 4
 This action was originally instituted on August 28, 1968, by certain Pasadena public school children and their parents as a class action against the Pasadena City Board of Education of the Pasadena Unified School District and certain officials thereof, seeking injunctive relief from alleged unconstitutional segregation of its public schools. The United States Government, also endeavoring to eliminate the discrimination, was permitted to intervene as a party plaintiff on December 4, 1968. On January 23, 1970, after a nine-day trial, the District Court entered its Decree, enjoining the Board and the Superintendent of Schools "from discriminating on the basis of race in the operation of the Pasadena Unified School District." Spangler v. Pasadena City Board of Education, 311 F.Supp. 501, 505 (C.D.Cal.1970). The court required the Board " . . . to prepare and adopt a plan to correct racial imbalance at all levels", and further directed that "(t)he plan shall provide for student assignments in such a manner that, by or before the beginning of the school year that commences in September of 1970 there shall be no school in the District, elementary or junior high or senior high school, with a majority of any minority students." 311 F.Supp. 501 at 505.[2]
 
 
 5
 In support of the 1970 Decree from which the appellants now seek relief, the District Court found that the Board had adopted a neighborhood school policy and a policy against forced cross-town busing which resulted "in racial imbalance and increasing racial imbalance." Id. at 506. Among the facts supporting the court's conclusion that the Board's policy violated the Fourteenth Amendment were findings that: (1) in numerous instances the Board changed attendance areas, changes having the net effect of increasing the percentage of blacks in schools that were already "black" and, correspondingly, increasing the percentage of whites in "white" schools, (Id. at 506-509); (2) the Board had consistently rejected proposals from its superintendent, citizens' committees, and other Board members that would result in significantly more racial integration, (Id. at 510); (3) the Board "used transportation provided at school district expense to make it possible for white children to avoid attending schools with greater percentages of black students enrolled than in the District as a whole", (Id. at 512); (4) very few black teachers were hired and most were assigned to schools with majority black enrollment (Id. at 513-516); (5) there was discrimination in the hiring and promotion of black administrators, (Id. at 516); (6) the Board placed transportable classrooms at black schools to accommodate over-enrollment at those schools while adjoining white schools had fewer transportables or none at all, (Id. at 518); and (7) the Board granted transfers "(which it) knew or should have known were wholly or at least in part motivated by racial considerations, including baseless transfers that had the effect of intensifying racial segregation in the Pasadena schools", (Id. at 520). Additionally, the court found that during the 1969-70 school year, 85 percent of the District's black elementary school students attended the eight majority black elementary schools, while 93 percent of its white elementary students attended the remaining 21 elementary schools, (Id. at 507).
 
 
 6
 Pursuant to the court's Decree a comprehensive desegregation plan (commonly called the "Pasadena Plan") was formulated by a task force consisting of various employees of the Pasadena Unified School District, under the direction of the Superintendent of Schools. The Pasadena Unified School District, although relatively small geographically, includes the city of Pasadena, the city of Sierra Madre, the town of Altadena, and various portions of Los Angeles County. Under the Pasadena Plan, as approved by the District Court on March 10, 1970, the District was divided into four ethnically balanced areas. Students are assigned to the schools in the area of their residence "in such a way as to develop an ethnic balance in each school", while retaining at the elementary level the concept of the neighborhood school by permitting students to "walk to a nearby school for part of their elementary schooling and be transported as a neighborhood to another school" for the remainder. The plan created primary schools covering grades kindergarten through third (K-3) and elementary schools covering the fourth through sixth (4-6) grades to replace the old concept of the neighborhood school encompassing kindergarten through the sixth grade (K-6). The plan altered the secondary school structure by shifting the ninth grade from the junior high schools to the senior high schools. Ethnically balanced secondary school attendance zones were drawn in a fashion that prevented any secondary school from having a "majority of any minority students." The plan provided for transportation for all students who attend school outside their normal areas, and students were permitted to transfer from their assigned schools to other schools in cases of "urgent hardship" involving considerations of curriculum, family circumstances, or medical-psychological factors.
 
 
 7
 At the commencement of the 1970-71 school year the Pasadena Plan was implemented, and it has ostensibly remained in effect since that time. On January 15, 1974, the motion which is the subject of this appeal was filed by the Board, now having a majority of newly elected members. A hearing on the motion was conducted on February 25, 26, 27 and March 1, 1974. On May 15, 1974, the District Court entered its opinion and order denying appellants' motion in its entirety. The District Court refused the requested relief from its Order of January 23, 1970, in view of the opposition which the Pasadena Plan had encountered and the fact that beginning in 1971, only a few months after the supposed implementation of the original plan, the District had violated the "no majority of any minority" portion of the injunction. By the time of the hearing in March, 1974, five Pasadena schools were operating in violation of the no majority of any minority portion of the court's injunction.[3] Spangler v. Pasadena City Board of Education, 375 F.Supp. 1304, 1306 (C.D.Cal.1974). The court further found that the Pasadena Plan had not been accorded such cooperation from the Board as would permit an assessment of its educational success or failure. (Id. at 1308); that the decline in white enrollment relative to total enrollment in Pasadena Schools since 1970 was not caused by the desegregation Order, since the decline closely approximated state-wide trends in California, (Id. at 1306); that the Alternative Plan was essentially a freedom of choice plan like those which had failed to desegregate Pasadena schools in the past, (Id. at 1311); and that it was unrealistic to believe that parents who fled the district because their children were forced to attend school with black children would now voluntarily choose that alternative under the Alternative Plan, (Id. at 1308).II. Relief From the Order of January 23, 1970 and Dissolution of the "No Majority of a Minority" Injunction.
 
 
 8
 It has long been established that in fashioning and effectuating school desegregation decrees, the courts are to be guided by traditional equitable principles. Brown v. Board of Education, 349 U.S. 294, 299-300, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (Brown II). " . . . (A) school desegregation case does not differ fundamentally from other cases involving the framing of equitable remedies to repair the denial of a constitutional right." Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 15-16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971). "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies" Swann, supra at 15, 91 S.Ct. at 1276. It is also firmly established that a federal court which has imposed an injunction also retains the power to suspend or modify it. System Federation v. Wright, 364 U.S. 642, 646-7, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961); United States v. Swift & Co.,286 U.S. 106, 114, 52 S.Ct. 460, 76 L.Ed. 999 (1932). The oft-quoted test for determining whether enough has been shown to justify the exercise of this power is whether there has been a change in conditions that is "so important that dangers, once substantial, have become attenuated to a shadow." Swift, supra, 286 U.S. at 119, 52 S.Ct. at 464 (Cardozo, J.). The question is whether a modification or dissolution can be made "without prejudice to the interests of the classes whom this particular restraint was intended to protect." Swift, supra 286 U.S. at 118, 52 S.Ct. at 463 (Cardozo, J.); or whether changed circumstances have rendered the injunction "an instrument of wrong." Lubben v. Selective Service System Local Board No. 27, 453 F.2d 645, 651 (2nd Cir. 1972). We further note that in making our determination as to whether the District Court abused its "broad" equitable powers by concluding that changed circumstances since 1970 have not attenuated the dangers present at that time "to a shadow", we are compelled to apply the clearly erroneous test to the trial judge's resolution of the factual issues raised by conflicting evidence bearing on the question of changed conditions. Fed.R.Civ.P. 52(a); United States v. Texas Ed. Agency, 459 F.2d 600 (5th Cir. 1972); Craggett v. Board of Education of Cleveland City School District, Cuyahoga County, Ohio, 338 F.2d 941 (6th Cir. 1964).
 
 
 9
 Applying the above standards to the case at hand, it would constitute an abuse of our power to hold that the District Court was clearly erroneous in finding that the appellants did not establish such a sufficient change in conditions as would require the court, in the exercise of its discretionary equitable powers, to modify or dissolve its earlier Decree. Accordingly, we affirm the court's denial of the appellants' motion insofar as that motion sought relief from the Orders of January 23 and March 10, 1970, and dissolution of the injunction requiring that there be no school in Pasadena wherein the student body consisted of a majority of a minority race. A careful review of the record reveals abundant evidence upon which the district judge, in the reasonable exercise of his discretion, could rightly determine that the "dangers" which induced the original determination of constitutional infringements in Pasadena have not diminished sufficiently to require modification or dissolution of the original Order. The Pasadena Unified School District has failed to comply with the "no majority of any minority" provision during three of the four years in which the Pasadena Plan has, pursuant to court order, supposed to have been in full effect and operation.[4] In its motion to dissolve the original injunction, the present Board has also sought the approval of a plan of the "freedom of choice" variety which would very likely result in rapid resegregation. A majority of the members of the present Pasadena City Board of Education ran for election principally on a platform which urged "stop forced busing of students and return them to their neighborhood schools."[5] It was against this background that the District Court concluded that to dissolve the court's "no majority of any minority" injunction would "surely be to sign the death warrant of the Pasadena Plan and its objectives." Spangler v. Pasadena City Board of Education, 375 F.Supp. 1304, 1309 (C.D.Cal.1974).
 
 
 10
 In support of their position that circumstances have significantly changed, appellants contended that the Pasadena Plan was responsible for a substantial portion of the "white flight" phenomenon that has occurred since the implementation of the plan. When the Pasadena Plan was first approved by the District Court, Caucasian students constituted a majority of the School District's enrollment (58.3 percent). At present Caucasians constitute a plurality of only 44.0 percent. The District Court rejected the appellants' contention on the basis of evidence that the trends in Pasadena closely approximate the state-wide trends in both segregated and desegregated California schools. Moreover, the Supreme Court has indicated that the existence of a "white flight" phenomenon does not excuse a school system from the constitutional duties imposed by Brown and its progeny. When confronted with such a contention in Monroe v. Board of Commissioners of the City of Jackson, Tennessee, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968), the Supreme Court said: "(w)e are frankly told in the Brief that without the transfer option it is apprehended that white students will flee the school system altogether. 'But it should go without saying that the vitality of these constitutional principles cannot be allowed to yield simply because of disagreement with them.' Brown II, at 300, 75 S.Ct. at 756." Id. at 459, 88 S.Ct. at 1705.
 
 
 11
 The appellants also asserted that the Pasadena Plan has proved to be an educational failure because student performance on certain standardized tests has declined, and the performance of black students on the tests has continued to fall 30 percentage points below that of white students. The Government's expert testified that the appellants achievement charts should be analyzed as a net gain for black students and that, under the Pasadena Plan, the white students had not suffered academically in relation to the national norms. Additional evidence was presented that under the existing Plan there have been few disciplinary problems and that the District has been able to implement a variety of innovative educational programs and alternatives. In the light of this evidence the district judge resolved the conflict against the appellants and refused to conclude that the Pasadena Plan had been demonstrated to be an educational failure.
 
 
 12
 The appellants have strongly urged that a constitutionally unitary school system has been achieved in Pasadena under the Plan and that the District Court was consequently required to grant their motion because of the following dictum in the opinion of the United States Supreme Court in Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 31-2, 91 S.Ct. 1267, 1283-1284, 28 L.Ed.2d 554 (1971):
 
 
 13
 "At some point, these school authorities and others like them should have achieved full compliance with this Court's decision in Brown I. The system would then be 'unitary' in the sense required by our decisions in Green and Alexander.
 
 
 14
 "It does not follow that the communities served by such systems will remain demographically stable, for in a growing, mobile society, few will do so. Neither school authorities or district courts are constitutionally required to make year-by-year adjustments of the racial composition of student bodies once the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the system. This does not mean that federal courts are without power to deal with future problems; but in the absence of a showing that either the school authorities or some other agency of the State has deliberately attempted to fix or alter demographic patterns to affect the racial composition of the schools, further intervention by a district court should not be necessary."[6]
 
 
 15
 In the years since Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the United States Supreme Court has consistently held that if de jure[7] school segregation is shown, there is "an affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." Green v. County School Board, 391 U.S. 430, 437-8, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968). See also, Milliken v. Bradley, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974); United States v. Scotland Neck Board of Education, 407 U.S. 484, 92 S.Ct. 2214, 33 L.Ed.2d 75 (1972); Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); Monroe v. Board of Commissioners, 391 U.S. 443, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968); Raney v. Board of Education, 391 U.S. 450, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968). "Having once found a violation, the district judge or school authorities should make every effort to achieve the greatest possible degree of actual desegregation, taking into account the practicalities of the situation. . . . The measure of any desegregation plan is its effectiveness." Davis v. Board of School Commissioners, 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577 (1971). The obligation of every school district is to "terminate dual school systems at once and to operate now and hereafter only unitary schools." Alexander v. Board of Education, 396 U.S. 19, 20, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969) (emphasis added). When viewed from the perspective of this long line of Supreme Court authority, we cannot conscientiously hold that the district judge abused his broad equitable discretion in refusing to modify or dissolve his Decree. His decision was primarily based upon his finding that there had not been a full and genuine implementation of his original Order such as would achieve the elimination of racial discrimination "root and branch." The directive of the dictum in Swann by its very terms becomes operative "once the affirmative duty to desegregate has been accomplished and racial discrimination is eliminated from the system." 402 U.S. 1, 31-32, 91 S.Ct. 1267, 1284, 28 L.Ed.2d 554 (1971) (emphasis added). On the specific facts of this case as revealed from the record and reiterated supra, it was reasonable for the District Court to conclude that full and effective elimination of racial discrimination had not been achieved during the three school years following the initial year in which the Pasadena Plan was in effect. If desegregation was "accomplished" or "eliminated" after the implementation of the Pasadena Plan, such was a transitory and temporary achievement, enduring for a period of the utmost brevity.[8]
 
 
 16
 We think it clear, however, that Swann indicates that annual readjustment is not necessary once a court has determined that there has been a full and genuine implementation which has eliminated, with some anticipated permanence, racial discrimination from the system. We must therefore expressly disapprove such portions of the record as suggest that the district judge interprets his injunction to require continuous annual redistricting. In the course of final argument the district judge stated that to him the Pasadena Plan meant " . . . that at least during my lifetime there would be no majority of any minority in any school in Pasadena." (Emphasis added). This remark, apparently spontaneous, cannot be broadly interpreted, inasmuch as it suggests that even after the court has determined that its plan has been effectively implemented and racial discrimination eliminated from the system, a disruptive juggling of students to correct de minimis alterations in racial balance in specific schools might be required annually, or even day by day. This is precisely what we interpret Swann to prohibit.[9]
 
 
 17
 III. Termination of the Continuing Jurisdiction of the District Court.
 
 
 18
 The portion of the appellants' motion seeking termination of the District Court's continuing supervision over the actions of the Board is susceptible to the same reasoning followed in Part II of this opinion, supra. The Supreme Court's policy in respect to the retention of jurisdiction by a District Court was unambiguously announced in Raney v. Board of Education,391 U.S. 443, 449, 88 S.Ct. 1697, 1700, 20 L.Ed.2d 727 (1967):
 
 
 19
 "In light of the complexities inhering in the disestablishment of state-established segregated school systems, Brown II contemplated that the better course would be to retain jurisdiction until it is clear that disestablishment has been achieved."
 
 
 20
 We hold that the District Court did not clearly err in concluding that it was not yet clear that the contemplated disestablishment of segregation had been achieved in the Pasadena Unified School District. In light of the School District's failure fully to comply with the "no majority of any minority" requirement for three successive years, and the fact that appellants sought to substitute a "freedom of choice" type of plan that the court found would likely result in resegregation, it was reasonable for the District Court to conclude that all vestiges of de jure segregation had not been eliminated. On these facts the court did not abuse its broad equitable discretion in finding an urgent need to retain, for some time, its jurisdiction of the controversy.[10]
 
 
 21
 IV. The Alternative Plan.
 
 
 22
 Finally, the appellants moved for modification of the Pasadena Plan to conform with what they have termed their "Alternative Plan." The "Integrated Zone/Educational Alternatives Plan" was approved by a four to one vote of the Board, and that plan applies only to students at the elementary level (grades K-6). Under the terms of the plan, specific elementary school attendance boundaries would be replaced with four racially and ethnically balanced zones corresponding to the four existing zones of the Pasadena Plan. Any student could choose to attend any school in his zone, with any necessary transportation provided at District expense. The present divided system of separate schools for grades K-3 and grades 3-6 would be replaced with traditional 4-6 schools. Each K-6 school, in addition to the "traditional" program taught there, would have a specialized "mini-school" offering a unique alternative program.[11] These unique alternatives would ostensibly result in voluntary integration by attracting a mix of students from all parts of the zone, with the schools in each zone competing for attendance. If racial imbalance should occur under the Alternative Plan, a program would then be implemented pairing "sister schools" of opposite ethnic composition for "shared experiences" attended by both schools for one-half day per week.
 
 
 23
 The appellants have insisted that since the Pasadena Plan was ordered implemented in September, 1970, a constitutionally unitary system has been established. Therefore, they argue that the District Court had an obligation to return local control to the School District so long as the proposed modifications did not violate the Constitution. Starting from our earlier premise that the District Court's determination that the School District had not yet effectively discharged its affirmative duty to eliminate segregation was not clearly erroneous, we hold that the District Court's refusal to permit substitution of the appellants' proposed Alternative Plan constituted a reasonable exercise of the court's equitable discretion.
 
 
 24
 The district judge found that the Alternative Plan was essentially a "freedom of choice" plan, and we are inclined to agree. The Supreme Court has acknowledged, as of 1968, the general "ineffectiveness" of such plans as "a tool of desegregation." Green v. County School Board, 391 U.S. 430, 440, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1967). The Court has directed that " . . . if there are reasonably available other ways, such for illustration as zoning, promising speedier and more effective conversion to a unitary, nonracial school system, 'freedom of choice' must be held unacceptable." (Id. at 441, 88 S.Ct. at 1696.) Our own court reached a similar conclusion in Kelly v. Guinn, 456 F.2d 100, 108-9 (9th Cir. 1972) wherein we observed:
 
 
 25
 "Freedom of choice plans usually, if not invariably, fail to eliminate school segregation. Such plans rest upon the theory that the school district's entire obligation is to refrain from excluding any student from the school because of race. But once it has been determined that a school district has contributed to the creation and maintenance of segregation, neutrality is no longer enough. Then the school district's duty is not limited to the removal of discriminatory bars to school integration; it is charged with an affirmative duty to eliminate segregation. 'Freedom of choice' plans operate 'simply to burden children and their parents with a responsibility which Brown II (347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873) placed squarely on the School Board.' The attempt to shift responsibility rarely works. The parents and children are either unable or unwilling to carry the burden. Not surprisingly, they failed to do so in this instance."[12]
 
 
 26
 There was ample evidence to support the District Court's conclusion that the proposed freedom of choice or "Alternative Plan" would not discharge the Board's duty to " . . . make every effort to achieve the greatest possible degree of actual desegregation . . . ." Davis v. Board of School Commissioners, 402 U.S. 33, at 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577 (1971). Previous efforts by Pasadena to desegregate by "freedom of choice" plans had failed. (Spangler, supra, 311 F.Supp. at 510). There was also evidence showing that freedom of choice plans in California locations, the cities of Richmond and San Bernardino, had been wholly unsuccessful.[13] On this record, we could not hold that the court abused its discretion in refusing to permit implementation of an Alternative Plan which it justifiably found highly unlikely to achieve the constitutionally required unitary school system in Pasadena.
 
 
 27
 Affirmed.
 
 CHAMBERS, Circuit Judge (concurring):
 
 28
 This is sad business. We had to have Brown v. The Board of Education[1] because seldom more than lip service was given to the ideal of equal education.
 
 
 29
 But we cannot perpetually homogenize school children every September. It won't be much of an education for any child if children have to go to a different school every year. Furthermore, a school district surely should not be kept under injunctions of a court forever. We are already involved from time to time in teachers' tenure. Next thing we shall find ourselves grading students' papers if we keep the schools under a court decree at all times.
 
 
 30
 Had the first Pasadena decree[2] been appealed to conclusion, I would have held, I believe, once in compliance, that the case should have been terminated and any future complaints should be the subject of a new action. But the appeal was dropped. So the school board was left under a continuing duty to homogenize and they have not done it beyond the first massive reassignment of pupils.
 
 
 31
 Thus, I think we cannot unring the latest orders of the district court retroactively. But I cannot go along with an order continuing, except for a short time, beyond one more reassignment of pupils that is found to be in compliance. Prospectively, I reject the edict that there shall never be a particular school with a "majority of any minority" or a majority of any minority as long as "(the district judge) live(s)." Never is a long time. No one can foresee future contingencies. Furthermore, one man's life is a slender thread for court decrees.
 
 
 32
 I interpret Judge Ely's opinion as requiring a termination of the mandatory injunction within a very short time after the school again gets in compliance and I think the message is clear to the district court.
 
 
 33
 I do not reach the merits of any other plan. This should be left to future adjudication in another case. I have some doubt that one will find any de jure segregation after the decree has been complied with again if all that is done is to let residence patterns shift by themselves.
 
 
 34
 As indicated above, I concur.
 
 WALLACE, Circuit Judge (dissenting):
 
 35
 I respectfully dissent.
 
 
 36
 My Brother Ely would affirm the district court's decision to continue the desegregation decree in effect and to retain jurisdiction for two reasons: because five schools over three years have had majority enrollments of Black students and because racial imbalance would result from implementation of the Alternative Plan if the injunction were dissolved. Although other reasons might justify continued enforcement of the injunction, these reasons do not. Racial balance is not a constitutional right. Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 24, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). The test for retaining jurisdiction and continuing a desegregation injunction in effect is not the school district's maintenance of an inflexible racial balance but whether "the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the system." Id. at 31-32, 91 S.Ct. at 1284. Because the district court did not consider this question, I believe it failed to apply the proper test and, therefore, I would reverse and remand.
 
 
 37
 The disposition I propose would jeopardize neither the desegregation already achieved nor that still necessary to remedy any de jure segregation which may remain in the Pasadena schools. The injunction would remain in effect pending the outcome of proceedings upon remand, see Johnson v. San Francisco Unified School Dist., 500 F.2d 349, 352 (9th Cir. 1974); Soria v. Oxnard School Dist. Bd. of Trustees, 488 F.2d 579, 588 (9th Cir. 1974), cert. denied, 416 U.S. 951, 94 S.Ct. 1961, 40 L.Ed.2d 301 (1974), and the Board of Education would bear the burden of proving that all segregation attributable to intentionally segregative action of the school district has been eliminated, see Keyes v. School Dist. No. 1, Denver, Colo., 413 U.S. 189, 207-13, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973); Swann v. Charlotte-Mecklenburg Bd. of Educ., supra, 402 U.S. at 26, 91 S.Ct. 1267. By relying solely upon past or predicted deviations from racial balance by the Pasadena schools, both the district court and Judge Ely needlessly reduce complex constitutional questions to mathematical ratios. See Fiss, The Fate of An Idea Whose Time Has Come: Antidiscrimination Law in the Second Decade after Brown v. Board of Education, 41 U.Chi.L.Rev. 742, 765-70 (1974). The district court's full consideration of the difficult questions presented by this case would not impede constitutionally required desegregation.
 
 
 38
 * The fundamental flaw in the district court's decision is its premise that there is no difference between de facto and de jure segregation. In its written opinion, the district court takes the position that the two are indistinguishable.[1] Were this true, a holding that the Pasadena schools must always maintain some degree of racial balance would undoubtedly be correct. Likewise, there would be no need to determine whether de jure segregation has been eliminated, since the existence of segregation of any kind would suffice to maintain the injunction in effect. But we have rejected the equivalence of de facto and de jure segregation and have held that segregation in public schools is unconstitutional only if it is de jure segregation; that is, only if it results from intentionally segregative state action. Johnson v. San Francisco Unified School Dist., supra, 500 F.2d at 351-52; Soria v. Oxnard School Dist. Bd. of Trustees, supra, 488 F.2d at 585-88; see Berkelman v. San Francisco Unified School Dist., 501 F.2d 1264, 1266-67 (9th Cir. 1974). The Supreme Court has impliedly, if not expressly, reached the same conclusion. Milliken v. Bradley, 418 U.S. 717, 745, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974); Keyes v. School Dist. No. 1, Denver, Colo., supra, 413 U.S. at 207-09, 93 S.Ct. 2686; Swann v. Charlotte-Mecklenburg Bd. of Educ., supra, 402 U.S. at 17-18, 25-27, 91 S.Ct. 1267; Spencer v. Kugler, 404 U.S. 1027, 92 S.Ct. 707, 30 L.Ed.2d 723 (1972) (mem.), aff'g, 326 F.Supp. 1235, 1239-43 (D.N.J.1971); cf. Note, 88 Harv.L.Rev. 61, 70 n.58 (1974).[2] Thus the justification for the desegregation decree in this case must be the de jure segregation found to exist in 1970, not de facto segregation existing before or after that date.
 
 II
 
 39
 The justification for the injunction determines its scope. The purpose of a desegregation decree is to remedy the underlying constitutional violation:
 
 
 40
 (T)he remedy is necessarily designed, as all remedies are, to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct.
 
 
 41
 Milliken v. Bradley, supra, 418 U.S. at 746, 94 S.Ct. at 3128; accord, Swann v. Charlotte-Mecklenburg Bd. of Educ., supra, 402 U.S. at 16, 91 S.Ct. 1267. The Supreme Court has expressly rejected the view that a desegregation injunction is designed to produce any specific degree of racial balance:
 
 
 42
 If we were to read the holding of the District Court to require, as a matter of substantive constitutional right, any particular degree of racial balance or mixing, that approach would be disapproved and we would be obliged to reverse. The constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole.
 
 
 43
 Swann v. Charlotte-Mecklenburg Bd. of Educ., supra, 402 U.S. at 24, 91 S.Ct. at 1280; accord, Milliken v. Bradley, supra, 418 U.S. at 745-746, 94 S.Ct. 3112; Drummond v. Acree, 409 U.S. 1228, 1230-31, 93 S.Ct. 18, 34 L.Ed.2d 33 (1972) (Powell, Circuit Justice); Winston-Salem Forsyth Bd. of Educ. v. Scott, 404 U.S. 1221, 1227-29, 1230-31, 92 S.Ct. 1236, 31 L.Ed.2d 441 (1971) (Burger, Circuit Justice) (dictum); Kelly v. Guinn, 456 F.2d 100, 110 (9th Cir. 1972), cert. denied, 413 U.S. 919, 93 S.Ct. 3048, 37 L.Ed.2d 1041 (1973). The district court's decision is inconsistent with these principles.
 
 
 44
 The district judge interpreted the injunction to require "that at least during my lifetime there would be no majority of any minority in any school in Pasadena." All of us disapprove of this statement but Judge Ely minimizes its significance. Although the district judge made this comment in announcing his decision from the bench, he did not depart from it in his published opinion. He allowed only impossibility of compliance as a reason for dissolving or suspending the prohibition against majority enrollments of minority students.[3] So interpreted, the injunction transforms racial balance from a means of remedying de jure segregation into an end in itself, precisely contrary to the principles expressed by the Supreme Court.
 
 
 45
 Nor is the district court's interpretation of the injunction permissible because the racial quota requires only "no majority of any minority." Although in Swann the Supreme Court considered a different kind of quota (i.e., one requiring that the racial balance in each school approximate that of the district as a whole), the principles applied in that case are equally applicable here. Kelly v. Guinn, supra, 456 F.2d at 110. The Court did not emphasize the kinds of quotas that are permissible but did indicate the proper role of quotas in devising remedies for de jure segregation.
 
 
 46
 We see therefore that the use made of mathematical ratios was no more than a starting point in the process of shaping a remedy, rather than an inflexible requirement. . . . Awareness of the racial composition of the whole school system is likely to be a useful starting point in shaping a remedy to correct past constitutional violations. In sum, the very limited use made of mathematical ratios was within the equitable remedial discretion of the District Court.
 
 
 47
 402 U.S. at 25, 91 S.Ct. at 1280.
 
 
 48
 Once the "no majority of any minority" provision of the injunction is deprived of a strict interpretation, the significance of the school district's violations diminishes greatly.[4] The injunction took effect in the fall of 1970. In October, 1970, no school had a majority Black enrollment. In October, 1971, one out of the 35 regular schools in the district had a majority Black enrollment (51.9%). In October, 1972, four schools were in violation, with Black enrollments of 53.9%, 53.4%, 52.0% and 50.1%. Finally, in October, 1973, five schools failed to comply, with Black enrollments of 60.2%, 56.8%, 55.3%, 52.9% and 51.3%. Thus, over the four-year period that the injunction has been in effect, only one school has had a Black enrollment exceeding 60% and only two have had an enrollment exceeding 55%, all in the most recent school year. During that time, the percentage Black enrollment in the district as a whole has increased from 32.8% (in October, 1970) to 40.0% (in October, 1973). Although the cause of this increase was disputed in the district court, see Spangler v. Pasadena City Bd. of Educ., 375 F.Supp. 1304, 1306, 1307-08 (C.D.Cal.1974), the increase itself, regardless of its cause, makes deviations from the prescribed quota both more difficult to avoid and less serious once they occur.[5]
 
 III
 
 49
 The same fundamental error that underlies the district court's inflexible interpretation of the injunction also underlies its failure to consider whether the racial imbalance foreseeable upon dissolution of the injunction is attributable to intentionally segregative actions of the school district. Both errors derive from its erroneous equivalence of de facto with de jure segregation and its neglect of the basic principle that "the scope of the remedy is determined by the nature and extent of the constitutional violation." Milliken v. Bradley, supra, 418 U.S. at 744, 94 S.Ct. at 3127. The corollary of the latter, which is relevant here, is that the need for a desegregation injunction ceases once de jure segregation has been eliminated. A unanimous Supreme Court has so stated:
 
 
 50
 Neither school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition of student bodies once the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the system. This does not mean that federal courts are without power to deal with future problems; but in the absence of a showing that either the school authorities or some other agency of the State has deliberately attempted to fix or alter demographic patterns to affect the racial composition of the schools, further intervention by a district court should not be necessary.
 
 
 51
 Swann v. Charlotte-Mecklenburg Bd. of Educ., supra, 402 U.S. at 31-32, 91 S.Ct. at 1284 (dictum); cf. Keyes v. School Dist. No. 1, Denver, Colo., supra, 413 U.S. at 211, 93 S.Ct. 2686 (dictum).[6]
 
 
 52
 Although the Alternative Plan is a freedom-of-choice plan and therefore an unlikely remedy for past de jure segregation, Green v. County School Bd. of New Kent County, 391 U.S. 430, 440, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); Kelly v. Guinn, supra, 456 F.2d at 108-09, it hardly follows that it is motivated by an intent to segregate or that it necessarily reflects the effects of past de jure segregation. The district court did not decide whether the Alternative Plan created or perpetuated de jure segregation, apparently because it believed that de facto segregation alone amounts to a constitutional violation. See Spangler v. Pasadena City Bd. of Educ., supra, 375 F.Supp. at 1307 & n.10. Although foreseeable segregation is relevant to the question whether the injunction should be dissolved, it is not dispositive. The question not addressed by the district court is crucial: whether the segregation foreseeable upon dissolution of the injunction is attributable to intentionally segregative actions of the school district.[7]
 
 
 53
 My Brother Ely also does not address this question, deferring instead to the equitable discretion of the district court upon the authority of Swann v. Charlotte-Mecklenburg Bd. of Educ., supra, 402 U.S. at 12, 15-16, 91 S.Ct. 1267. Although Swann endorses the discretion of the district courts to formulate and modify desegregation decrees, it also places important restrictions upon that discretion, among them the requirement that the injunction be terminated when de jure segregation has been abolished. Indeed, immediately before its discussion of this restriction, the Court states:
 
 
 54
 However, in seeking to define the scope of remedial power or the limits on remedial power of courts in an area as sensitive as we deal with here, words are poor instruments to convey the sense of basic fairness inherent in equity. Substance, not semantics, must govern, and we have sought to suggest the nature of limitations without frustrating the appropriate scope of equity.
 
 
 55
 Id. at 31, 91 S.Ct. at 1283 (emphasis added); accord, id. at 6, 91 S.Ct. 1267. A sound interpretation of the whole of Swann must yield the conclusion that the equitable discretion of the district court continues only so long as de jure segregation persists.
 
 
 56
 Nor can this restriction be weakened, as my Brother Ely would have it,[8] into a caution against strict enforcement of racial quotas once de jure segregation has been eliminated. Another passage in Swann, discussed earlier, requires that racial quotas be flexibly interpreted even before de jure segregation has been eliminated. 402 U.S. at 24-25, 91 S.Ct. 1267. The prohibition against "further intervention" cannot mean the same thing. More important, Judge Ely's interpretation of the prohibition against "further intervention" would permit the desegregation decree to be prolonged beyond the continued existence of de jure segregation, contrary to the principle that the scope of the constitutional violation determines the scope of the remedy. See Milliken v. Bradley, supra, 418 U.S. at 744, 94 S.Ct. 3112; cf. Keyes v. School Dist. No. 1, Denver, Colo., supra, 413 U.S. at 211, 93 S.Ct. 2686 (dictum). Since there is no substantive right to any particular racial balance, a perpetual injunction directed toward that goal cannot be justified as a flexible remedy for past de jure segregation. Note, 43 U.Cin.L.Rev. 922, 928 (1974).
 
 
 57
 The same test that determines whether the injunction should be dissolved also determines whether jurisdiction should be relinquished. Although the Supreme Court has required that jurisdiction be retained "until it is clear that disestablishment has been achieved," Raney v. Board of Educ. of the Gould School Dist., 391 U.S. 443, 449, 88 S.Ct. 1697, 1700, 20 L.Ed.2d 727 (1968), that requirement is met if the school district proves that de jure segregation has been abolished. Once the school district has met this burden of proof, further intervention by the court is justified only upon a showing of new de jure segregation. Swann v. Charlotte-Mecklenburg Bd. of Educ., supra, 402 U.S. at 32, 91 S.Ct. 1267 (dictum). Because the burden of proof then returns to the plaintiffs, they could just as well file a new action as file a petition for relief in a court that possesses continuing jurisdiction. In addition, because the injunction also is dissolved, jurisdiction need not be retained to supervise compliance. Hence, continued jurisdiction serves no purpose after the school district has shown that de jure segregation has been eliminated.
 
 IV
 
 58
 The school district's burden of proof, however, is not easily met. The Supreme Court has held that once de jure segregation has been found in one part of a school system, the school district must show that de facto segregation elsewhere in the system is not the result of any intentionally segregative action on its part. Keyes v. School Dist. No. 1, Denver, Colo., supra, 413 U.S. at 207-13, 93 S.Ct. 2686. So too, here,[9] the Board of Education must prove that any segregation reasonably foreseeable upon dissolution of the injunction is not the result of any intentionally segregative actions of the Pasadena Unified School District.[10] The Board must show that the Alternative Plan is not motivated by an intent to segregate and that there is no present or foreseeable segregation which is attributable to any intentionally segregative actions of the school district, either those found in 1970 or any committed thereafter. See Swann v. Charlotte-Mecklenburg Bd. of Educ., supra, 402 U.S. at 26, 91 S.Ct. 1267; Note, 88 Harv.L.Rev. 61, 67-69 (1974).
 
 V
 
 59
 The heavy burden of proof upon the Board of Education renders the majority's decision all the more difficult to understand. Returning this case to the district court would not hinder constitutionally required desegregation. Instead, it would allow the crucial question in this case to be decided: whether de jure segregation has been eliminated from the Pasadena schools. The majority avoids this issue by deferring to the equitable discretion of the district court but the district court did not reach this question because it erroneously equated de facto with de jure segregation. The district court must eventually decide this question. As Judge Chambers notes in his concurring opinion, the Board of Education will sooner or later renew its motion to dissolve or modify the injunction. Instead of surmising from the record how the district court would have decided a question it did not face, I would reverse and remand for a determination whether de jure segregation still exists in the Pasadena schools.
 
 
 60
 Therefore, I dissent.
 
 
 
 [1]
 We note that one of the basic legal issues presented by this appeal, the question of when and under what circumstances a school district may compel a federal district court to relinquish jurisdiction and end its supervision, has not yet been directly addressed by any Courts of Appeals or by the United States Supreme Court. See generally Craven, Integrating the Desegregation Vocabulary Brown Rides North, Maybe, 73 W.Va.L.Rev. 1 (1971); Fiss, The Charlotte-Mecklenburg Case Its Significance for Northern School Desegregation, 38 U.Chi.L.Rev. 697 (1971); Comment, 39 U.Chi.L.Rev. 421, 436-40 (1972)
 
 
 [2]
 A majority of the Board voted not to appeal the District Court's original Decree. Thereafter a group of parents filed a motion in the District Court for leave to intervene as defendants for the purpose of perfecting an appeal. The motion was denied on March 4, 1970, and the movants appealed to this court. On June 15, 1970, we affirmed, Spangler v. Pasadena City Board of Education, 427 F.2d 1352 (9th Cir. 1970)
 
 
 [3]
 As of the beginning of the 1973 school year, the Pasadena Unified School District operated 32 regular schools, having an enrollment of approximately 44 percent Anglo-Caucasians and 40 percent blacks. At the time of the initial implementation of the Pasadena Plan (1970-71) every school in the District was in literal compliance with the court's order. No school had a Negro enrollment as high as 50 percent, and in only three schools was the Negro enrollment greater than the Anglo-Caucasian enrollment. In the 1971-72 school year, one school (Loma Alta) slipped out of compliance with the no majority of any minority standard. In 1972-73 four schools, in violation of the court's order, had a black enrollment in excess of 50 percent, and in seven other schools the black enrollment exceeded that of Anglo-Caucasian students. By 1973-74, five schools were in violation of the court's order (Franklin, Sierra Mesa, Edison, Loma Alta, and Eliot), and sixteen others had a Negro enrollment exceeding that of Anglo-Caucasians
 
 
 [4]
 In Kelly v. Guinn, 456 F.2d 100 (9th Cir. 1972), our court upheld a desegregation order that was very similar to the one in this case. In Kelly, the decree specified "that the black enrollment in any elementary school in the Clark County District shall not exceed fifty percent of the total enrollment in such grade." 456 F.2d at 109
 It should be noted that a trial stipulation in the present case recited that plaintiff and the Government-intervenor were aware "of no violations of the Pasadena Plan up to and including the present." The appellees explain that the stipulation was based on the parties interpretation of the plan, which was inconsistent with the interpretation of the District Court. The District Court was not, of course obliged to accept, as absolutely controlling, a stipulation of the parties as to a question of law or a mixed question of law and fact. Estate of Sanford v. Commissioner, 308 U.S. 39, 51, 60 S.Ct. 51, 84 L.Ed. 20 (1939); Swift & Co. v. Hocking Valley Ry., 243 U.S. 281, 289, 37 S.Ct. 287, 61 L.Ed. 722 (1917); Los Angeles Shipbuilding & Drydock Corporation v. United States, 289 F.2d 222 (9th Cir. 1961). Furthermore, contrary to that of which the parties may have been "aware" at the time of the stipulation, the evidence at the trial established undeniably that significant violations of the Pasadena Plan had previously occurred and continued to exist.
 
 
 [5]
 The appellants' claim that the rationale applied by the district judge in denying the appellants' motion was a conclusion that the Board and its new members had acted in "bad faith." In our view the good or bad faith of the school authorities is irrelevant to the issues presented. In upholding the District Court, we have assumed that the actions of the Board and its authorities were, from their viewpoint, committed in good faith
 
 
 [6]
 The substance of the dictum in Swann was partially codified by the Congress on August 21, 1974:
 "Effect of Certain Population Changes on Certain Actions
 Sec. 208. When a court of competent jurisdiction determines that a school system is desegregated, or that it meets the constitutional requirements, or that it is a unitary system, or that it has no vestiges of a dual system, and thereafter residential shifts in population occur which result in school population changes in any school within such a desegregated school system, such school population changes so occurring shall not, per se, constitute a cause for civil action for a new plan of desegregation or for modification of the court approved plan." Pub.L. No. 93-380, § 208 (Aug. 21, 1974), 88 Stat. 484.
 It bears emphasis that the prohibition of the statute is triggered when a court determines that a desegregated unitary system, with no vestiges of a dual system, has been established. This is precisely that which has not yet occurred in this case. It should also be noted that the statute prohibits new plans or modification of the court approved plan. The statute does not purport to cover the question here presented, i. e., whether an existing plan should be continued.
 
 
 [7]
 In their brief appellants state that in the original decision of the District Court directing the School Board to desegregate "there was no finding of state imposed segregation." They further assert that "(t)he constitutional violation found against appellants in 1970 was relatively minor." We think that these declarations are erroneous. The original opinion of the District Court, as we discussed supra, detailed a series of purposeful actions by the School Board resulting in de jure segregation. The meaning of the term de jure is clarified in Soria v. Oxnard School District Board of Trustees, 488 F.2d 579, 585 (9th Cir. 1973), wherein we wrote in the context of interpreting Keyes v. School District No. 1, Denver Colorado, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973):
 The Court emphasized that the differentiating factor between so-called de facto segregation and the de jure segregation held constitutionally impermissible in Brown v. Board of Education (I), 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) was that in the latter case there was present a purpose or intent to segregate."
 
 
 [8]
 In this connection it is highly significant that United States Court of Appeals for the Fifth Circuit routinely requires that the District Court in a desegregation case should retain jurisdiction for a period of at least three years before dismissing such cases upon a determination that the school district has achieved unitary status. In United States v. State of Texas, et al. (San Felipe Del Rio Consolidated Independent School District), 509 F.2d 192 (5th Cir. 1975), the District Court, acting sua sponte, without notice or an opportunity for a hearing as to any opposition thereto, found that the objective of a unitary school system had been achieved and dismissed the action. In doing so, the court expressly relied upon the Swann dictum. On appeal the dismissal was vacated and the cause remanded because under the standards enunciated in Youngblood v. Board of Public Instruction, 448 F.2d 770 (5th Cir. 1971), the District Courts of the Fifth Circuit are directed to retain jurisdiction for a period not less than three school years, during which the school district is required to file semi-annual reports with the District Court. In United States v. Texas, etc., supra, only three such reports had been filed, and therefore the Court of Appeals concluded:
 "Once these reports have been filed, then upon proper notice, and following a hearing if one is appropriately sought, the District Court may proceed to determine whether San Felipe Del Rio has achieved unitary status. If it has, then a dismissal is not out of order.
 "If, however, such reports have not been or cannot now be filed then the matter may not be considered until three additional semi-annual reports have been filed in due course." (509 F.2d at 194).
 Thus, the Fifth Circuit obviously shares our view that a district judge must not be prematurely divested of his traditional power to supervise his equitable decrees.
 
 
 [9]
 See United States v. Wilcox County Board of Education, 494 F.2d 575, 579 at n. 2 (5th Cir. 1974)
 
 
 [10]
 The appellants have not cited, nor have we found, any case in which a District Court, acting upon a request for dissolution of a detailed desegregation injunction, has relinquished jurisdiction entirely. The procedure that has uniformly been followed when an initial and specific regulatory desegregation injunction has been dissolved has been the reduction of the controversy to an inactive status on the court's docket. The matter may then be re-activated on proper application by any party, or on the court's own motion, should it appear that further proceedings have definitely become necessary. See, e. g., United States v. Georgia, N.D.Ga., Civil Action No. 12,972 (Order entered July 23, 1973); United States v. County School Board of Sussex County, E.D.Va., Civil Action No. 606-R (Order filed July 5, 1973); United States v. County School Board of Sussex County, E.D.Va., Civil Action No. 224-69-R (Order filed July 5 1973)
 
 
 [11]
 The unique alternatives proposed included a fine and performing arts program, an animal and plant life program, a daily newspaper based program, a community-career awareness program, a social science-science program, a foreign language and cultural program, and an early childhood education program
 
 
 [12]
 Among the numerous cases in which Courts of Appeals have found "freedom of choice" plans unacceptable are United States v. Georgia, 466 F.2d 197 (5th Cir. 1972); Brunson v. Board of Trustees of School District No. 1 of Clarendon County, S. C., 429 F.2d 820 (4th Cir. 1970); Clark v. Board of Education of Little Rock School District, 426 F.2d 1035 (8th Cir. 1970), cert. denied, 402 U.S. 952, 91 S.Ct. 1608, 29 L.Ed.2d 122 (1971); Hilson v. Outzts, 425 F.2d 219 (5th Cir. 1970); Hall v. St. Helena Parish School Board, 424 F.2d 320 (5th Cir. 1970); United States v. Board of Education of Baldwin County, 423 F.2d 1013 (5th Cir. 1970); Steele v. Board of Public Instruction of Leon County, 421 F.2d 1382 (5th Cir. 1970); Boykins v. Fairfield Board of Education, 421 F.2d 1330 (5th Cir. 1970); United States v. Choctaw County Board of Education, 417 F.2d 838, 841 (5th Cir. 1969); United States v. Jefferson County Board of Education, 417 F.2d 834, 836 (5th Cir. 1969); United States v. Lovett, 416 F.2d 386, 392 (8th Cir. 1969); Walker v. County Board of Brunswick County, 413 F.2d 53 (4th Cir. 1969), cert. denied, 396 U.S. 1061, 90 S.Ct. 753, 24 L.Ed.2d 755 (1970); United States v. Greenwood Municipal Separate School District, 406 F.2d 1086 (5th Cir. 1969), cert. denied, 395 U.S. 907, 89 S.Ct. 1749, 23 L.Ed.2d 220 (1969)
 
 
 [13]
 The San Bernardino plan attracted only 15 percent of the Negro students, and no whites participated. The Richmond plan had an 11 percent Negro participation over the course of three years and, there again, no whites participated, 375 F.Supp. at 1307. This failure occurred despite the fact that these plans promised that efforts would be made to make minority neighborhood schools attractive to all students and that free transportation was provided for any student wishing to attend school outside his neighborhood
 
 
 [1]
 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954)
 
 
 [2]
 311 F.Supp. 501 (C.D.Cal.1970)
 
 
 [1]
 There appears to be, in logic, no distinction between de jure and de facto segregation for our purposes. "De jure" and "de facto" are only adjectives that give some attempted "legal" distinction to the aims of Brown v. Board of Education I, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and Brown v. Board of Education II, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) that "segregation " denies equal educational opportunity. See also, Keyes v. School District Number One, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973), Mr. Justice Powell, concurring and dissenting
 Spangler v. Pasadena City Bd. of Educ., 375 F.Supp. 1304, 1307 n.10 (C.D.Cal.1974) (emphasis in first sentence added). The district judge's statements from the bench reflect the same error.
 
 
 [2]
 It might be thought that the Supreme Court declined to decide this issue in Keyes, by reserving the question "whether a 'neighborhood school policy' of itself will justify racial or ethnic concentrations in the absence of a finding that school authorities have committed acts constituting de jure segregation." Keyes v. School Dist. No. 1, Denver, Colo., 413 U.S. 189, 212, 93 S.Ct. 2686, 2699, 37 L.Ed.2d 548 (1973). This passage, however, must be interpreted to leave open only the question whether segregated neighborhoods in combination with a neighborhood school policy give rise to a presumption of de jure segregation
 The Court held in Keyes that where de jure segregation has been found in one part of a school district, de facto segregation in the remainder of the district is constitutionally permissible, provided the school district can show that such segregation did not result from any intentionally segregative actions on its part. Id. at 207-13, 93 S.Ct. 2686. Likewise, in Swann the Court held that, in a school system undergoing desegregation, a few schools predominantly of one race are permissible if the school district can prove that their racial composition did not result from discriminatory actions on its part. Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 26, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). Hence, even when de jure segregation has been found in a school district, de facto segregation is permissible upon a showing that it did not result from intentionally discriminatory actions. A fortiori, in the absence of de jure segregation, de facto segregation must also be permissible. The question left open in Keyes is whether the school district must show lack of de jure segregation when a neighborhood school policy, neutral on its face, results in segregation. See Ybarra v. City of San Jose, 503 F.2d 1041, 1042-43 & n.2 (9th Cir. 1974). Compare Johnson v. San Francisco Unified School Dist., 500 F.2d 349, 351 n.1 (9th Cir. 1974) (dictum).
 
 
 [3]
 The Court recognizes that conceivable circumstances exist in which that mandate could not reasonably be met. Pasadena, however, does not present such a circumstance at this time
 Spangler v. Pasadena City Bd. of Educ., 375 F.Supp. 1304, 1307 n.11 (C.D.Cal.1974).
 
 
 [4]
 In addition, the significance of the district's violation of the "no majority of any minority" provision of the injunction should be judged in light of the parties' stipulation, which was not simply that these violations are insignificant, but that they never occurred. While this stipulation was not binding upon the district court, it does indicate how the parties interpreted the "no majority of any minority" language in the injunction and whether the deviations are evidence of persisting de jure segregation
 
 
 [5]
 At the hearing, the district court also concluded that the school district had violated the hiring provisions of the injunction but it does not refer to these violations in its written opinion. These violations too would be open to consideration upon remand
 
 
 [6]
 Although the statement quoted from Swann is dictum, neither the majority nor any other court has refused to rely upon it for that reason
 
 
 [7]
 The district court mentions this issue in only two conclusory sentences:
 To (dissolve the injunction) would in light of the avowed aims of four members of a five-member Board surely be to sign the death warrant of the Pasadena Plan and its objectives.
 Spangler v. Pasadena City Bd. of Educ., 375 F.Supp. 1304, 1309 (C.D.Cal.1974).
 Unfortunately, I cannot make that finding (that the school district has become unitary), because I think that from the evidence that was presented to me I find still some vestiges that would indicate that the Board has not completely made this School District a unitary school district.
 Oral opinion. However, these statements must be taken in the context of the district court's failure to abandon its erroneous equivalence of de facto with de jure segregation.
 
 
 [8]
 Judge Chambers apparently does not concur in this portion of Judge Ely's opinion. Judge Ely apparently would enforce the "no majority of any minority" provision of the injunction indefinitely but would allow de minimis deviations after de jure segregation has been eliminated. Judge Chambers apparently would abandon the injunction entirely once de jure segregation has been abolished
 
 
 [9]
 The de jure segregation found in 1970, and not reviewed by us, was attributed in part to the school district's failure to compensate for residential segregation. In turn, this residential segregation was attributed in part to public and in part to private discrimination. Spangler v. Pasadena City Bd. of Educ., 311 F.Supp. 501, 504-05, 512-13, 522 (C.D.Cal.1970). However, the only constitutional violations found by the district court were those of the school district in failing to compensate for residential segregation. Id. at 524. Likewise, no evidence was presented in the proceedings now on appeal that state entities other than the school district had committed constitutional violations. Hence, this case does not present the question whether constitutional violations of other state entities would justify continued enforcement of an injunction against the school district. See Milliken v. Bradley, 418 U.S. 717, 728 n.7, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974); id. at 755, 94 S.Ct. 3112 (Stewart, J., concurring); Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 22-23, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); Ybarra v. City of San Jose, 503 F.2d 1041, 1043 (9th Cir. 1974)
 
 
 [10]
 I do not believe that proving an absence of de jure segregation requires no more than proving momentary compliance with a desegregation injunction. The school district must prove that all present and reasonably foreseeable segregation is divorced from any intentionally segregative action on its part
 Further, when the school board presents a new plan to replace the injunction, proving momentary compliance leaves the most difficult elements of its case unproved: first, that the plan to replace the injunction lacks any segregative intent; and second, that any segregation reasonably foreseeable upon implementation of the plan is not attributable to any past, intentionally segregative actions on its part. As the Supreme Court has made clear, such conclusions are not easily proved. Keyes v. School Dist. No. 1, Denver, Colo., 413 U.S. 189, 207-13, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973).