Nancy Anne **SPANGLER** et al.,
Plaintiffs,

**United States of America** et al.,
Plaintiff-Intervenor,

v.

**PASADENA CITY BOARD OF EDUCA-TION** et al., Defendants.

**Civ. A. No. 68–1438–R.**

United States District Court,
C. D. California.

May 3, 1974.

A. L. Wirin, Fred Okrand, John D. O'Loughlin, Jill Jakes, ACLU Foundation of Southern Cal., Los Angeles, Cal., for plaintiff.

William D. Keller, U. S. Atty., Frederick M. Brosio, Jr., Asst. U. S. Atty., James Stotter II, Chief, Civil Division, Brian K. Landsberg, Samuel J. Flanagan, Los Angeles, Cal., for plaintiff-intervenor.

Paul, Hastings, Janofsky & Walker, Lee G. Paul, Robert G. Lane, Peter D. Collisson, Los Angeles, Cal., for defendants.

REAL, District Judge.

Defendant, Pasadena City Board of Education (hereafter Board)[1] now moves the court for:

1. Relief from this Court's order of January 23, 1970, for the desegregation of Pasadena schools and the Court's order of March 10, 1970, approving the plan of desegregation submitted by defendants (hereafter Pasadena Plan);

2. Dissolution of the injunction that there be no school with a majority of any minority, under which the Board is presently operating;

3. Termination of the Court's continuing jurisdiction;

4. Alternatively, for modification of the Pasadena Plan approved March 10, 1970.

## I. MODIFICATION OF THE PASADENA PLAN AND RELIEF FROM THE ORDER OF JANUARY 23, 1970.

In January, 1970, this Court found racial imbalance or segregation of student bodies and faculties in the Pasadena Unified School District resulting from the Board's actions and inactions in execution of an announced dedication to the neighborhood school concept of education and its opposition to forced cross-town busing. 311 F.Supp. 501 (C.D.Cal.1970).

While no appeal was taken from that ruling, it was, to say the very least, not received with unanimous approbation. Indeed, according to the Board's position in the proceeding at bar, this Court's ruling in 1970 is the sole and proximate cause of "white flight" from Pasadena schools and is, in addition, a barrier to achieving the excellence of educational opportunity which the Board now proposes to accomplish by means of its requested substituted plan, known as The Integrated Zone/Educational Alternatives Plan: A Proposed Modification to the "Pasadena Plan" (hereafter Alternative Plan).[2]

The posture of the Board in 1970 notwithstanding, opposition to the Pasadena Plan came early. The plan had not yet been approved when on March 2, 1970, a Motion for Leave to Intervene to

1. The Board at the time of the Court's January, 1970, order was composed of Mrs. La Verne La Motte, Messrs. Albert C. Lowe, D. Joseph Engholm, Bradford C. Houser and John T. Welsh.

At the time of this hearing, the Board consisted of Messrs. Henry Marcheschi (elected in 1971), Samuel Sheats (appointed in 1971), Lymon W. Newton (elected in 1973), and Drs. Henry Myers and Richard Vetterli, (both elected in 1973).

2. Appendix A to this opinion.

oppose and appeal the judgment of this Court was filed, led by Mr. Bradford C. Houser. This motion was heard and denied by this Court on March 4, 1970. Appeal was taken of this ruling to the Court of Appeals for the Ninth Circuit, which affirmed the ruling of this Court. Spangler v. Pasadena City Board of Education, 9 Cir., 427 F.2d 1352, cert. denied 402 U.S. 943, 91 S.Ct. 1607, 29 L.Ed.2d 111.

Only temporarily rebuffed, those who were determined that the Pasadena Plan would not succeed carried on their crusade. In April of 1970[3] a recall campaign against the three members of the Board who had voted against appeal of this Court's judgment[4] was commenced. With the pledge to *"STOP* FORCED BUSING", Frank C. Crowhurst, Richard W. Millar, Jr., and Henry Marcheschi[5] unsuccessfully attempted to unseat Mrs. La Motte, Mr. Lowe and Dr. Engholm in the recall election of October 13, 1970.

Implementation of the Pasadena Plan was accomplished with the commencement of the 1970–1971 academic year in September of 1970. However, compliance was literal for only the first academic year; for, starting with the 1971–72 academic year, black student enrollment at the Loma Alta School exceeded 50 per cent of the school's total enrollment. By October of the 1972–73 academic year, four schools (Edison, Franklin, Loma Alta and Sierra Mesa) had black student enrollments of more than 50 per cent of the total student body. In the 1973–74 academic year, Eliot Junior High was added to the list of nonconformance; so, at the time of hearing of this matter in March of 1974, five Pasadena schools were and remain in violation of the no majority of any minority injunction of this Court's January, 1970, ruling.

3. Five months before the Pasadena Plan was to be implemented.

4. Mrs. La Verne La Motte, Albert C. Lowe and Joseph Engholm.

5. Mr. Marcheschi is presently president of the Board of Education of the Pasadena Unified School District.

The Board through the testimony of Dr. Robert Dillworth informs the Court that white enrollment relative to total enrollment in Pasadena schools has been precipitously in decline since 1970 due entirely to this Court's desegregation order. The Court rejects this conclusion relative to causation since Dr. Dillworth, admittedly, made no inquiry of anyone as to the reasons for: (1) white or black students moving from Pasadena or (2) white or black student withdrawal from the Pasadena Unified School District. He makes a statistical "guess" as to the cause of "white flight" on the basis that, statistically, it is unnecessary to ask the motivations behind the actions of people. When faced with a direct question, however, he finally admitted to the Court that he could not say "why" students, white or black, left the Pasadena Unified School District. It is of further significance that Pasadena's experience is not unique; for the trends evidenced in Pasadena closely approximate the state-wide trends in California schools, both segregated and desegregated, since 1966.

Achievement of the desegregation proposed by the Pasadena Plan provided for division of the traditional elementary school[6] into primary (K–3) and upper grade (4–6) schools for two reasons:

1. " . . . Students will walk to a nearby school for part of their elementary schooling and be transported with students in their neighborhoods to another school to provide ethnic balance.[7]

2. " . . . reorganization of elementary schools into primary schools (K–3) and upper schools (4–6) will provide specialization which is important to guarantee improvement in basic skills." [8]

6. The Alternative Plan reaches only Kindergarten through Grade 6 schools.

7. Defendants' Exhibit A, page 4.

8. Defendants' Exhibit A, page 5.

The Alternative Plan would return to the K–6 organization of elementary education in order to "provide a sufficient number of school sites within each zone from which parents can choose the type of education most appropriate for each of their children." Howsoever denominated, the Alternative Plan is a "freedom of choice" plan that must overcome, if implemented, a large number [9] of predictably racially imbalanced schools.

The freedom of choice offered by the Alternative Plan is not new either to the law or to Pasadena. The Supreme Court in Green v. County School Board of New Kent County, Virginia (1968) 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 warns us:

" . . . in desegregating a dual system a plan utilizing 'freedom of choice' is not an end in itself. As Judge Sobeloff has put it,

' "Freedom of choice" is not a sacred talisman; it is only a means to a constitutionally required end—the abolition of the system of segregation and its effects. If the means prove effective, it is acceptable, but if it fails to undo segregation, other means must be used to achieve this end. The school officials have a continuing duty to take whatever action may be necessary to create a "unitary, nonracial system." ' " Id. at 440.

The facts of Green, supra, may not exactly parallel what this Court found in Pasadena in 1970 or what evidently exists in Pasadena in 1974; but the message of Green, supra, is clear. Before any Court can stamp its imprimatur to a proposed "freedom of choice" plan of desegregation—or of continuing desegregation—it must be satisfied that freedom of choice is a viable alternative to a plan which can guarantee that no school in a once-segregated [10] school district shall be permitted to have an enrollment with a majority of any minority.[11]

Pasadena has previously failed to desegregate its schools by freedom of choice plans (Spangler, supra, 311 F. Supp. at 510); and efforts by other California school districts [12] laboring under freedom of choice plans have been less than spectacularly successful in achieving any meaningful desegregation of their respective schools.

What the Alternative Plan and its advocates—four of the present five Board members [13]—offer is the hope that "establishment of unique educational alternatives at each K–6 school site" and "salesmanship" will convince enough "white parents" whose children have left the Pasadena Unified School District to return and choose the same "educational alternatives" that black parents do in order to accomplish an integrated school system. Hope may spring eternal, but

9. Initially, at least eight schools—Audubon, Cleveland, Edison, Franklin, Jackson, Lincoln, Madison and Washington—would have over 60 per cent black enrollment.

10. There appears to be, in logic, no distinction between de jure and de facto segregation for our purposes. "De jure" and "de facto" are only adjectives that give some attempted "legal" distinction to the aims of Brown v. Board of Education I, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and Brown v. Board of Education II, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) that "segregation" denies equal educational opportunity. See also, Keyes v. School District Number One, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed. 2d 548 (1973), Mr. Justice Powell, concurring and dissenting.

11. The Court recognizes that conceivable circumstances exist in which that mandate could not reasonably be met. Pasadena, however, does not present such a circumstance at this time.

12. In San Bernardino, California, a freedom of choice plan attracted only 15 per cent of the Negro student enrollment—no whites participated.
In Richmond, California, a freedom of choice plan conducted over a three-year period had an 11 per cent Negro student participation—no whites participated.

13. Mr. Samuel Sheats, the only black member of the Board, vigorously opposes the Alternative Plan.

realism exposes the folly of the belief that one who left a school district because his children were forced to attend schools with Negro children would now voluntarily choose that alternative.[14]

 There is yet another flaw in the Alternative Plan with its "mini-school" sales pitch. Mini-schools and the "unique educational alternatives" which they offer can be implemented under the Pasadena Plan. This Court does not intend to intimate that the quest for the best possible education to be made available to all the school children of Pasadena is not a laudable motive. It is the mandate of *Brown I, supra,* and *Brown II, supra,* and all the cases decided by the various courts of this land. But, the mandate is equally clear that school boards must do all they can to constitutionally accommodate the rights of minorities wherever they are found to conflict with the desires of the majority to do otherwise. Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969); Davis v. Board of School Commissioners, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971); Wright v. City of Emporia, 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1971); Monroe v. Board of Commissioners, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 33 (1968). The evidence has not shown that the educational opportunities presented by the Alternative Plan are equal to, or superior to, those presently available under the Pasadena Plan. If those educators—many within the Pasadena Unified School District itself—

who advocate that a multiracial society requires a multiracial educational setting are to be believed, the Pasadena Plan is better suited to that objective than the Alternative Plan.[15]

The Board urges the Court to abandon the Pasadena Plan because it is not succeeding educationally. The evidence offered in support of the Board's position is neither persuasive nor adequate to measure the educational benefits or inadequacies of the Pasadena Plan. Aside from the contrary evidence introduced by plaintiff-intervenor to show some educational progress, it takes little educational expertise to recognize that the Pasadena Plan has not had the cooperation from the Board that permits a realistic measurement of its educational success or failure.[16] No one can now estimate the possible results of the Pasadena Plan had it enjoyed the continued support of a Board who would act, as they profess, to "do unto others as you would have done unto you."[17] As such, the Board has not met its burden in any way sufficiently enough to have this Court rule upon this issue.

It may, perhaps, belabor the point, but, finally, the evidence shows that as much or more busing would be necessary to accomplish the ends of an integrated school system under the Alternative Plan as is currently required to achieve the same ends under the Pasadena Plan. There is, therefore, none of the fiscal advantage which was presaged by the campaign literature promising "reduced taxes—more education at less cost."

14. Presumably, these are the same white parents who helped elect Mr. Marcheschi, Dr. Vetterli, Dr. Meyers and Mr. Newton in response to the campaign promise to "STOP FORCED BUSING."

15. Mr. Ramon C. Cortines, Superintendent of Schools of the Pasadena Unified School District, stating his opinion with candor and courage in response to a direct inquiry, testified that the Pasadena Plan, though it may need some modifications, was preferable to the Alternative Plan in achieving an educationally sound plan for an integrated school system.

16. This is not the Court's plan. The Pasadena Plan was prepared by dedicated Pasadena educators, aided by the California State Department of Education's Bureau of Intergroup Relations. That their efforts have met such vocal and active resistance may be the whole tragedy of the claims of the present Board relative to its inadequacy.

17. The present Board through the testimony of Mr. Marcheschi asks this Court for the opportunity (three or more years) to prove —by implementation—that the Alternative Plan can succeed. This, the Court would assume, is with the full support of the people of Pasadena.

## II. DISSOLUTION OF THE COURT'S INJUNCTION

■ Modification of the injunction of this Court of January 23, 1970, would, in effect, leave the Board to its own devices concerning the Pasadena Plan and its continued viability as a mandate for desegregation. To grant such relief would—in light of the avowed aims of four members of a five-member Board —surely be to sign the death warrant of the Pasadena Plan and its objectives. The law does not permit such an easy abdication of a Court's constitutional responsibility. Brown v. Board of Education II, *supra*; Raney v. Board of Education, 391 U.S. 443, 88 S.Ct. 1689, 20 L.Ed.2d 727 (1968); Green v. County School Board, *supra*. Moreover, the Board's professions of good faith do not serve to alter this result. Alexander v. Holmes County Board of Education, *supra*.

## III. TERMINATION OF THIS COURT'S CONTINUING SUPERVISION OVER THE ACTIONS OF THE BOARD.

■ The reasons set forth in Parts I and II of this opinion make clear the Court's inability to accede to this final request by the Board.

Therefore, the motions of the defendants are denied.

This opinion shall, as provided in Federal Rules of Civil Procedure Rule 52(a) be deemed to be the findings of fact and conclusions of law of the Court in this matter.

### APPENDIX

### PASADENA UNIFIED SCHOOL DISTRICT

### December 18, 1973

## THE INTEGRATED ZONE/EDUCATIONAL ALTERNATIVES PLAN A PROPOSED MODIFICATION TO THE "PASADENA PLAN"

### INTRODUCTION

Because five of the District's 32 regular schools now have a majority of a minority race and an additional six schools are within a few percentage points of joining this category, certain modifications to the Pasadena Plan are mandatory. The proposed modifications are designed to insure as much continuity with the present form of public education in Pasadena as possible. The overall effect of these modifications will be to allow parents to express more freedom in choosing the location and type of education available to each of their children and to motivate schools to compete for attendance of these children.

### MODIFICATIONS

(1) The first modification involves a return to the elementary system, Kindergarten through Grade 6, thereby discontinuing the current primary (K–3), elementary (4–6) organization. This change is necessary to provide a sufficient number of school sites within each zone from which parents can choose the type of education most appropriate for each of their children.

(2) The second modification involves establishment of unique educational alternatives at each K–6 school site in addition to the ongoing traditional program being taught there. Studies have shown that sufficient excess capacity exists to accomplish this easily. Each unique alternative is to be designed and placed at a particular school site so that it acts as a "magnet" to draw students from all parts of a zone, thus encouraging integration.

The following are some unique alternatives which, in addition to instruction in the basic skills, can provide exciting educational opportunities (see Exhibit A for additional information about each opportunity) for children:

1. *Alternative School Program*—Emphasizes the regular curriculum in an unstructured environment.

2. *Fundamental School Program*— Emphasizes the regular curriculum in a structured environment.

3. *A Fine and Performing Arts Program*—Will emphasize creative experiences in art, music, drama, dance, and literature.

4. *An Animal and Plant Life Program*—Will emphasize first-hand experience with actual raising of crops and animals.

5. *A Daily Newspaper-Based Program*—Will use the daily newspaper as the basis for study in reading, mathematics, social science, science, art, and other areas.

6. *A School in the Community/Career Awareness Program*—Will emphasize direct experiences with institutions and activities in the community as the basis of study.

7. *A Social Science/Science Program*—Will emphasize multi-cultural studies and outdoor, ecology-oriented studies.

8. *A Foreign Language and Cultural Program*—Will emphasize the mastery of a foreign language and the understanding of its cultural setting.

9. *An Early Childhood Education Program*—Will encompass children from four (4) to eight (8) years of age and provide multiple educational experiences that may prepare them for higher achievement in subsequent grades.

The specific, unique alternatives located at each school site will be defined prior to the beginning of the 1974–75 school year.

The existing special schools, including the Fundamental School and the Alternative School, will be maintained and expanded if necessary to act as special District-wide "magnet schools". These schools have already demonstrated their ability to promote integration on a voluntary basis. Additional magnet schools may be added such as a year-round school.

(3) The third modification involves the elimination of specific elementary school attendance boundaries. In their place four racially and ethnically balanced zones, representative of the district as a whole, will be created whose boundaries coincide with the four existing areas on which the present Pasadena Plan is designed. Exhibit B shows the zones, their boundaries, and the schools contained in each zone. Any parent who lives within a zone may choose to send his child to any school within that zone. The school district will provide all required transportation. Thus, all students who are presently enrolled in our schools would be able to continue to attend the school that they now attend if their parents so choose or they would be free to choose from any other school within their zone.

(4) On the basis of providing parents with new options as to the type of education available, the ethnic balance at some sites may be altered from what it is at present. It is, therefore, proposed that if any school's ethnic profile should deviate significantly from the District-wide ethnic profile, that school would be paired with a "sister school" with an opposite ethnic make-up. District transportation would then be provided so that students from both schools would share in special educational programs covering at least one-half a school day per week. These special educational programs will be available to students on an optional basis. Examples may include cooperative art/music programs or programs similar to those alternatives outlined previously. The special programs will be designed to encourage interest and desire to participate.

## UNMODIFIED FEATURES OF THE PASADENA PLAN

The four modifications presented apply to the elementary grades (K–6) only. Modifications related to junior high school and senior high school attendance areas present special problems and are now being studied by the school district administrators at the direction of the Board of Education.

Finally, all other features of the present Pasadena Plan including teacher recruitment and assignment, personnel advancement, recruitment and advancement of administrators, etc., are to remain as operating currently.

CONCLUSION

The proposed modifications are designed to demonstrate affirmative action on the District's part to stimulate integration within each zone without mandatory assignment of students. Further, the proposed modifications will allow parents to choose the type of education they want for each of their children.

The modifications will introduce the element of competition among the schools in each zone for pupil attendance, thereby introducing a critical new element to improve the quality of education in Pasadena schools.

Finally, the modifications are designed to stabilize the ethnic composition of the school district so that meaningful integration can take place.

EXHIBIT A ·

Every elementary school in the district will provide for each student a program in the basic skills of reading, mathematics, and language arts as well as physical education. Additionally special programs such as, compensatory education (Title I, ESEA) mentally gifted minors (MGM), and others that are now a part of the regular school program will continue.

One of the mini-schools suggested below would be a component within the regular school.

Students would have the opportunity to attend the mini-school for instruction in subjects other than the basic skills based on their interest in that school's alternative emphasis. Students may also receive this instruction in these subjects in the regular program being taught at that school.

For example, a student living near Altadena School has a number of choices. He may attend Altadena's regular school program or its mini-school *or* he can choose the regular school program or any mini-school at any other school within that zone.

The following are brief descriptions of *some* possible mini-schools suggested to date:

1. *Fine and Performing Arts Mini-School* will provide opportunities for students to create music, dance, write and enjoy prose and poetry, as well as original plays. Students will have many opportunities to perform for the public, and to exhibit their work in the community. Extensive involvement of community resources is planned.

2. *Media/Current Events Mini-School* will use daily and weekly newspapers as the basis for study in reading, mathematics, social science, and other areas. The diversity of types of information in each newspaper makes it a good tool for instruction in many areas. Additionally, students will write, setup, and print their own newspaper on a regular basis using the techniques and equipment commonly used in the production of a daily newspaper.

3. *A Foreign Languages and Cultures Mini-School* will emphasize the mastery of a foreign language and the understanding of its cultural setting. Language specialists will give instruction for a block of time each day in French, Spanish, Russian or German, and Japanese or Chinese. In addition, time will be devoted daily to studies of the cultures and peoples represented by these languages by a teacher trained in multi-cultural studies and intergroup activities.

4. *A School in the Community/Career Awareness* Mini-School will emphasize direct experiences with institutions and activities in the community as the basis of study. Trips to various places in the community, including

provision for instruction as these sites will be central to this program. Students will not only learn about the existence of agencies, jobs, and institutions, but also how they work and how students can train themselves to qualify for a career in a variety of fields.

5. *An Animal and Plant Life Mini-School* will emphasize first-hand experiences with the actual raising of animals and crops. Facilities will be provided so that a wide varity of experiences in horticulture and husbandry may be presented. An appreciation of labor and the discovery of various phases of development of animal and plant life will be integral parts of this program.

6. *A Social Science/Science Mini-School* will emphasize multi-cultural studies as well as outdoor, ecology-oriented studies. A few foreign countries and cultures will be studied in depth and compared with our life here in the United States. These studies will include customs and life styles, government and sociology. Additionally, outdoor educational experiences will be provided many times during the school year with emphasis on the study of the environment and the impact of developed and undeveloped societies on their environment.

7. *An early Childhood Education Mini-School* will provide a design with a variety of classroom structure, educational experiences in language, reading, mathematics, music, art, science, physical activity and health that will develop a readiness base and continuum of skills in primary grades. Parent participation is essential in all phases of the program to insure the child's well-being and progress.