Nancy Anne SPANGLER, by her father and next friend, James E. Spangler, Jr., et al., Plaintiffs-Appellees,

and

Sharon Hughes Spangler, etc., et al., Plaintiffs-Intervenors-Appellees,

and

United States of America, Plaintiff-Intervenor-Appellee,

v.

PASADENA CITY BOARD OF EDUCA-TION et al., Defendants-Appellants.

Nos. 77–2902, 77–2941 and 78–2266.

United States Court of Appeals, Ninth Circuit.

June 6, 1979.

As Amended on Denial of Rehearing and Rehearing En Banc Sept. 20, 1979.

John R. McDonough, Ball, Hunt, Hart, Brown & Baerwitz, Beverly Hills, Cal., for defendants-appellants.

Fred Okrand, Gary Paul, Attys., ACLU Foundation of Southern California, Los Angeles, Cal., for plaintiffs-appellees.

Brian Landsberg, Atty., U. S. Dept. of Justice, Washington, D. C., for plaintiff-intervenor-appellee.

1. Three appeals are consolidated here. The Board is the named appellant in Nos. 77–2902 and 77–2941; certain individual Board members appeal in No. 78–2266. For convenience, all appellants are referred to herein as "the Board".

2. Chapters of the *Spangler v. Pasadena City Board of Education* history appear in the following: 415 F.2d 1242 (9th Cir. 1969); 311

Before GOODWIN, KENNEDY, and ANDERSON, Circuit Judges.

GOODWIN, Circuit Judge:

The Pasadena City Board of Education [1] appeals three orders which denied, inter alia, the Board's motions to dissolve certain injunctions and to relinquish, after nearly ten years, the court's continuing jurisdiction.[2]

The challenged orders followed hearings in which the Board tried to show to the district court that all racial segregation found in 1970 to be unlawful had been remedied to the extent that segregation of public schools in Pasadena could be remedied by Board action.

The objective evidence presented by the Board in support of its motions showed substantial compliance with existing valid court orders. A resolution by the Board also pledged continued good faith efforts to comply with the letter and spirit of the law.

The district court was unimpressed by the Board's exhibits and testimony. The court's memorandum opinion indicated its belief that, unless it retained jurisdiction, the Board might at some future date, by action or inaction, cause or suffer to occur some degree of avoidable "resegregation".

The Board now asks, in effect, "If not now, and on this showing, when, and on what showing," will the governance of the school system be restored to the elected officials who are charged with that governance under state law? It is a good question.

The appellees, who oppose the relinquishment of jurisdiction at this time, or any time in the foreseeable future, came for-

F.Supp. 501 (C.D.Cal.1970) (no appeal taken); 427 F.2d 1352 (9th Cir. 1970); 375 F.Supp. 1304 (C.D.Cal.1974) aff'd, 519 F.2d 430 (9th Cir. 1975), rev'd, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976); 384 F.Supp. 846 (C.D.Cal. 1974), modified, 537 F.2d 1031 (9th Cir. 1976); 549 F.2d 733 (9th Cir. 1977); and 552 F.2d 1326 (9th Cir. 1977).

ward with no solid evidence to support their resistance. They rely generally upon the theory that, because the Board was found in 1970 to have allowed illegally segregated schools to exist, the Board carries a substantial burden of proving that lifting judicial control will not prejudice the interests of the class judicial intervention was intended to protect. The appellees conclude that it is too soon to relinquish jurisdiction.

The district court expressed the belief that the Board, unless monitored by the court and constrained by injunctions, will act less vigorously and less effectively to root out the residual effects of historic segregation than it would under the spur of judicial supervision.

■ If the question were one to be left solely to the discretion of the district court, it would be difficult to characterize the court's orders as an abuse of discretion in this case. The record is replete with indications supporting the district judge's belief that the Board would more aggressively work to reverse the effects of past segregation if supervised by the court. But matters of convenience, or vague charges about lack of aggressiveness, or differences of opinion about who can best manage the future course of desegregation in a troubled school district, are insufficient grounds for the permanent interposition of judicial control over an activity of local government that by law is consigned to an elected school board.

■ Application of equitable principles in the wake of a finding of de jure school segregation requires the court to focus upon three factors. The first factor is the nature and scope of the constitutional violation. The second is the remedial objective: to restore, as nearly as possible, the victims of discrimination to the position they would have occupied in the absence of illegal conduct. The third factor is the interests of state and local authorities in managing their own affairs, consistent with the Constitution. *Milliken v. Bradley*, 433 U.S. 267, 280–81, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977).

Compliance with the 1970 Pasadena Plan under the supervision of the district court for the past eight years has been consistent with the first two factors noted in *Milliken v. Bradley, supra*. The third factor, however, remains to be considered.

The displacement of local government by a federal court is presumed to be temporary. Three years ago, when a motion for relinquishment of jurisdiction was denied, this court affirmed the denial. *Spangler v. Pasadena City Board of Education*, 519 F.2d 430 (9th Cir. 1975), *rev'd on other grounds, Pasadena City Board of Education v. Spangler*, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976). But a careful reading of the three opinions filed by this court reveals nothing to encourage the district court in its contemplation of permanent supervision of attendance plans for the Pasadena school system. *See Spangler v. Pasadena City Board of Education*, 519 F.2d at 440 (concurring opinion of Judge Chambers) *and* 519 F.2d at 441 (dissenting opinion of Judge Wallace). The subsequent review by the Supreme Court, which struck down part of the district court's 1970 decree, left intact the court's continuing jurisdiction. But that decision said nothing to indicate that judicial control should continue in perpetuity.

■ The district court's conclusion that it should continue to supervise the integration efforts of the Board ignored both the Board's present compliance and its representations that it would continue to engage in affirmative action in the future in support of integration.

The Board's resolution is an official act. It is entitled to be viewed by the judiciary as a pledge made in good faith, with and among its members, the patrons of the school district, and the general public. To anticipate in this court that the resolution will be forgotten, or to attribute its adoption to motives of expediency, is unwarranted.

If the Board, after the conclusion of this litigation, should prove that we are wrong, the courts remain open. Any future act of de jure segregation will be dealt with according to law.

The judgments and orders appealed from in the three numbered appeals are vacated. The cause is remanded to the district court for the entry of a decree approving the Pasadena Plan of 1970 as modified by subsequent valid orders; terminating the case; and to the extent that costs and attorney fees have been incurred after April 27, 1977, providing that each party shall pay its own.

Vacated and remanded.

J. BLAINE ANDERSON, Circuit Judge, concurs in the reasoning and the result reached in the separate opinions of GOODWIN and KENNEDY, Circuit Judges.

KENNEDY, Circuit Judge, concurring:

The issue to be determined here is whether the district court should have terminated its jurisdiction nine years after it ordered a full and complete remedy for desegregating the Pasadena schools. I concur fully in the opinion of the court and write separately to give emphasis to certain aspects of this case.

■ The remedy ordered by a federal court to correct racial segregation in a school system may not be more extensive than is necessary to eliminate the effects of the constitutional violation that was the predicate for the court's intervention. This principle has been stated by the Supreme Court in several desegregation cases. *See, e. g. Brennan v. Armstrong*, 433 U.S. 672, 672–73, 97 S.Ct. 2907, 53 L.Ed.2d 1044 (1977); *School District of Omaha v. United States*, 433 U.S. 667, 668–69, 97 S.Ct. 2905, 53 L.Ed.2d 1039 (1977); *Milliken v. Bradley*, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977); *Austin Independent School District v. United States*, 429 U.S. 990, 97 S.Ct. 517, 50 L.Ed.2d 603 (1976); *Keyes v. School District No. 1*, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973); *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 31–32, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). In *Dayton Board of Education v. Brinkman*, 433 U.S. 406, 420, 97 S.Ct. 2766, 2775, 53 L.Ed.2d 851 (1977), the Court said:

If [intentional discrimination by the school board is] found, the District Court in the first instance, subject to review by the Court of Appeals, must determine how much incremental segregative effect these violations had on the racial distribution of the Dayton school population as presently constituted, when that distribution is compared to what it would have been in the absence of such constitutional violations. The remedy must be designed to redress that difference . . . .

It follows from these principles that when a court ordered remedy has accomplished its purpose, jurisdiction should terminate. The relinquishment of jurisdiction in a proper case serves to restore to the state and local agencies the legal responsibility for supervising a school system that is properly theirs, and this too is a necessary consideration in fixing the duration of the court's remedial supervision. *Milliken v. Bradley, supra* 433 U.S. at 280–81, 97 S.Ct. 2749.

While the principles which limit the scope and duration of court remedies are easily stated, they are difficult to apply in a particular case. Whether or not the initial constitutional violation can be defined with precision, the effects of the violation and proper duration of the remedy are difficult to measure. *See, e. g., Milliken v. Bradley, supra; Booker v. Special District No. 1*, 451 F.Supp. 659 (D.Minn.1978); Wolf, *Northern School Desegregation and Residential Choice*, 1977 S.Ct.Rev. 63; Note, *Retention of Jurisdiction in Desegregation Cases: a Causal and Attitudinal Analysis*, 52 S.Cal.L. Rev. 195 (1978). *See generally Columbus Board of Education v. Penick* —— U.S. ——, ——, 99 S.Ct. 2941, 2988, 61 L.Ed.2d 666 (1979) (Powell, dissenting). Especially is this so where the original findings of intentional discrimination, often made years ago, are not phrased in terms of the incremental segregative effect that board violations had on the racial distribution of a school population.[1]

---

1. In this case, for example, the original findings of the district court as to "The Adverse Consequences of Racial Segregation" were:

27. Racial integration provides positive educational benefits. One purpose of education is to prepare children for living in our socie-

When this case was before the Supreme Court in 1976, *Pasadena Board of Education v. Spangler*, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976), the Court provided certain guidelines for us to follow by its discussion of the possibility that compliance with the plan would entitle the Board to relief from the district court's order:

> At oral argument the Solicitor General discussed the Government's belief that if, as petitioners have represented, they have complied with the District Court's order during the intervening two years [from 1974 to 1976], they will probably be entitled to a lifting of the District Court's order in its entirety. Tr. of Oral Arg. 28–31. And while any determination of compliance or noncompliance must, of course, comport with our holding today, it must also depend on factual determinations which the Court of Appeals and the District Court are in a far better position than we are to make in the first instance.

*Id.* at 440–41, 96 S.Ct. at 2707.

In determining whether the district court has taken the necessary steps to correct the constitutional violation, it is critical to bear in mind that the district court's approval of the Pasadena Plan in 1970 was a full and complete remedy. The Supreme Court explicitly held that the Pasadena Plan was not a step-at-a-time remedy, but rather was a remedy whose "implementation did 'achieve a system of determining admission to the public schools on a nonracial basis.'" *Id.* at 435, 96 S.Ct. at 2704, *quoting Brown v. Board of Education*, 349 U.S. 294, 300–01, 75 S.Ct. 753, 99 L.Ed. 1083 (1955).[2] In

reliance on that proposition, the Court held that the district court could not require the Board to redraw attendance zones annually so that there would not be a majority of any minority in any Pasadena public school. It is thus the law of the case that the Pasadena Plan establishes a racially neutral and hence constitutional method of student selection.[3]

Recognizing the difficulties inherent in defining the temporal duration of a desegregation remedy, the evidence presented to the district court in support of the motion for termination of jurisdiction showed that the effects of the Board's pre–1970 discrimination have been eliminated, and the trial court's jurisdiction should be relinquished. The Board was in substantial compliance with the plan for the period 1970–1974. It was in total compliance during the period 1974–1976, the "intervening two years" referred to in the Supreme Court's opinion, 427 U.S. at 441, 96 S.Ct. 2197; and there has been no showing of noncompliance in any degree since that date.[4]

■ The district court found that the Board "has acted—and failed to act—with the same segregative intent this court found in 1970." The principal support for the court's finding was its observation that if jurisdiction were terminated the Board intended to return to the neighborhood school pattern existing before 1970, a configuration that would make current racial percentages in the schools resemble the pre–1970 percentages. The court also noted that various members of the Board, appar-

---

ty, which is a multi-racial society. In addition, racial segregation imposes a badge of inferiority on minority students; integration is necessary to remove that badge.

*Spangler v. Pasadena City Board of Education*, 311 F.Supp. 501, 513 (C.D.Cal.1970). Unlike some courts, the district court did not require implementation of extensive remedial education programs to eliminate the adverse educational effects of the School Board's past discrimination. See the discussion of the district court's plan in *Milliken v. Bradley, supra*.

2. Other courts have recognized that this conclusion was central to the Court's holding. *See, e. g., Haycraft v. Board of Education*, 560

F.2d 755, 756 (6th Cir. 1977); *United States v. Seminole County School District*, 553 F.2d 992, 994–95 & n.7 (5th Cir. 1977); *Parent Association of Andrew Jackson School v. Ambach*, 451 F.Supp. 1056, 1078 (E.D.N.Y.1978).

3. Only the student assignment aspect of the Plan was cited by the district court in its decision as a grounds for retaining jurisdiction.

4. The Government notes that from 1970 to 1977, the Board was not in complete compliance with the Pasadena Plan on only thirteen occasions.

ently during an election campaign and also after election to the Board, had made public statements criticizing the Pasadena Plan and endorsing neighborhood schools. This finding of continuing intentional discrimination by the Board cannot be sustained. It rests on an erroneous interpretation of controlling precedents, and the evidence does not support the conclusion that the school board harbors an intent to establish, or return to, a dual system.

■ The district court appeared to hold that the school board is constitutionally obligated to provide for a certain racial mix in its schools. It stated:

Segregation can only be defined in percentages. Depending upon the view of a particular individual 100% separation of races may be the definitive norm to be applied—to another it may be a 20% separation of races. No case has yet given a definitive standard of what "segregation" is for remedial purposes. Certainly no one can deny that a school with a majority of a particular race is at least racially identifiable as a "white" or a "black" school depending upon the majority racial composition of that student body.

It is too easy to cop-out to demographics. To permit a school board operating under state compulsory education laws a choice to leave things as they are when reasonable alternatives are available to provide an integrated educational experience rejects the true meaning of the constitutional promise of equal protection of the law. . . . . If the law is real—if the Constitution is viable—then school boards necessarily have the constitutional duty to do all they reasonably can to avert or correct the inequality of separate education.

Viewed as a definition of the proper objective for a desegregation remedy, this statement is erroneous. The Supreme Court has emphasized that when a large percentage of minority students in a neighborhood school results from housing patterns for which school authorities are not responsible, the school board may not be charged with unconstitutional discrimination if a racially neutral assignment method is adopted. *See, e. g., Pasadena Board of Education v. Spangler, supra* 427 U.S. at 434–36, 96 S.Ct. 2697; *Milliken v. Bradley, supra* 433 U.S. at 280 n.14, 97 S.Ct. 2749; *Swann v. Charlotte-Mecklenburg Board of Education, supra* 402 U.S. at 26, 91 S.Ct. 1267. Further, the district court's premise appears at odds with recent cases defining unconstitutional discrimination and the necessity for proving a causal nexus between the alleged improper motive and the government action complained of. *See, e. g., Mount Healthy School District v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed. 417 (1977); *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 264–70, 270–71 n.20, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

From the standpoint of racial balance in pupil assignments, compliance with the Pasadena Plan for nine years is sufficient in this case, given the nature and degree of the initial violation, to cure the effects of previous improper assignment policies. Further delay in returning full responsibility for administration to the school board is unjustified.

The district court held also that jurisdiction should be retained because of a likelihood that the Board would engage in new acts of intentional discrimination. The district court concluded, and the plaintiffs contend, that in a desegregation case jurisdiction must be retained not only until the effects of past Board discrimination have been eliminated but also until the court is satisfied that the Board will not engage in new acts of discrimination in the future.

The principal finding relied on by the district court to support its conclusion was that the Board, if released from the court's jurisdiction, would return to some form of neighborhood schools policy, which in turn would increase racial imbalance in Pasadena schools. The court noted that various members of the Board had expressed publicly a desire to change the Pasadena Plan. Another factor considered important by the court was that at times since 1970 the

Board had tentatively explored in studies and surveys alternative student assignment methods, some of which apparently would increase racial imbalance in relation to the Pasadena Plan.

■ I assume, without deciding, that the likelihood a school board will engage in new acts of intentional discrimination may be considered by a court as one factor in favor of retaining jurisdiction to insure the effects of a past violation are eliminated,[5] although I have doubts whether there is always a logical nexus between the objective of eliminating the effects of a past violation and a finding that a future violation might occur. The district court's conclusion, nevertheless, is clearly erroneous based on this record. A policy favoring neighborhood schools is not synonymous with an intent to violate the constitution, see p. —— *supra*. Adopting a student assignment method different from the Pasadena Plan may have the foreseeable effect of increasing racial imbalance in the Pasadena schools. This fact is relevant in determining whether a plan was adopted as the result of invidious intent, but other factors must also be examined. *See Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed. 2d 870 (1979) ("'Discriminatory purpose,' however, implies more than intent as volition or intent as awareness of consequences.") *Columbus Board of Education v. Penick*, —— U.S. ——, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979). *Arlington Heights, supra* at 266–68; *Mount Healthy School District v. Doyle, supra.* Many of these additional factors depend on the record developed during the actual decision-making process. The fact that the Board has explored assignment alternatives which may increase racial imbalance provides little support for the conclusion either that the Board will in fact adopt these proposals in the future, or that the proposals, if adopted, would result from constitutionally infirm motives. In addition, before the district court's hearings, the Board passed an official resolution promising not only to engage in no acts of intentional discrimination, but also to adopt and maintain "affirmative action programs designed to improve racial integration among students, faculty and administrative staff of the District."[6] This resolution is further

---

**5.** The district court and the United States viewed *United States v. Swift & Co.*, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932), and *Louisiana v. United States*, 380 U.S. 145, 154, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965), as stating the controlling principles regarding when termination of a court's jurisdiction over its equitable judgments is proper. In *Swift* the Court said:

There is need to keep in mind steadily the limits of inquiry proper to the case before us. We are asking ourselves whether anything has happened that will justify us now in changing a decree. . . . The inquiry for us is whether the changes [in circumstances] are so important that dangers, once substantial, have become attenuated to a shadow. . . . Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation.

286 U.S. at 119, 52 S.Ct. at 464. *Swift* involved the efforts of antitrust defendants who had entered into a consent decree prohibiting anti-competitive actions to modify the decree by lifting some of its prohibitions. It is doubtful the case supports the district court's retention of jurisdiction. *Swift* establishes general criteria for dissolution or modification of prohibitory injunctions against private wrongdoers. More recent Supreme Court desegregation decisions have established specific criteria for dissolution of regulatory injunctions imposed upon public school authorities. As noted above, these criteria recognize (1) that the proper function of a school desegregation decree is remedial, and (2) necessary concern for the important values of local control of public school systems dictates that a federal court's regulatory control of such systems not extend beyond the time required to remedy the effects of past intentional discrimination. *See Milliken v. Bradley, supra* 433 U.S. at 280–82, 97 S.Ct. 2749.

**6.** The text of the resolution provides in part:

NOW, THEREFORE, BE IT RESOLVED THAT:

1. The Pasadena Unified School District shall be operated at all times in conformity with the United States Constitution, federal law, and all decrees and orders of the Court in the Federal Action and all of the following paragraphs of this resolution are adopted subject to this policy.

2. This Board, the District, and officers and employees of the District shall never adopt any policy or program, institute any practice or procedure, or make or carry out any decision for the purpose of discriminating against any person by reason of race, color, or ethnic iden-

evidence that the Board is not likely to engage in new acts of intentional discrimination. The Board's future actions may at some date be held unconstitutional, but it was error for the district court to conclude now that the Board was not likely to remain in compliance with the Constitution if jurisdiction was terminated.

■ The United States on appeal argues that the Board's intentions for future pro-

tification and all of the following paragraphs of this resolution are adopted subject to this policy.

3. The primary goal, objective and policy of this Board, the District, and the officers and employees thereof is and shall continue to be to provide the maximum educational opportunity that can be made available to every student in every school of the District by the prudent, efficient and effective use of the resources available to the District.

4. This Board, the District, and all officers and employees of the District shall continue to adopt, maintain and implement affirmative action programs designed to improve racial integration among students, faculty and administrative staff of the District.

5. In formulating policies and programs, adopting practices and procedures, and making and carrying out decisions, this Board, the District, and the officers and employees of the District shall give primary initial consideration to the question whether the proposed policies, programs, practices, procedures and decisions will contribute to the realization of the educational objective, goal, and policy of the District stated in paragraph 3 of this resolution.

6. One of the factors to be taken into account in determining the desirability of a proposed policy, program, practice, procedure or decision of the District is whether its adoption and implementation will tend to enhance racial integration among students, faculty, and/or administrative staff of the District.

7. If and when it should appear to this Board or to the officers or employees of the District that a proposed policy, program, practice, procedure or decision, which is otherwise educationally desirable, may threaten to diminish racial integration among students, faculty and/or administrative staff of the District, such proposed policy, program, practice procedure or decision shall be reviewed with a view to making such modifications thereof as will eliminate or reduce such effect; after such review has been completed, a determination shall be made as to whether the educational desirability of the policy, program, practice, procedure or decision appears to be so great as to justify the remaining effect on racial integration which it may have.

grams are also made relevant by reason of 20 U.S.C. § 1718. In part that section provides:

Any court order requiring, directly or indirectly, the transportation of students for the purpose of remedying a denial of the equal protection of the laws may, to the extent of such transportation, be terminated if the court finds the defendant educational agency has satisfied the re-

8. It shall be the policy and practice of this Board, the District, and the officers and employees of the District to review the policies, programs, practices, procedures and decisions of the District, from time to time, to see whether they appear to be having an adverse effect upon racial integration among the students, faculty and/or administrative staff of the District and, should such an effect be observed, to determine whether and how the policy, program, practice, procedure or decision of the District may be modified without substantially impairing its educational efficacy, to eliminate or diminish such adverse effect.

9. It shall be the endeavor of this Board, the District, and the officers and employees of the District to promote racial integration within the District by giving appropriate consideration and weight to reducing the possibility that families of any race, color or ethnic identification will, because of District policies, programs, practices, procedures or decisions (a) decline to move into the District or (b) move out of the District or (c) while residing in the District, send their children to schools other than District schools.

10. It shall be the policy of the Board, the District, and the officers and employees of the District to solicit, receive and give appropriate consideration and weight to the view of all elements of the community in evaluating and determining existing and proposed District policies, programs, practices, procedures and decisions.

11. It shall be the policy of this Board, the District, and the officers and employees of the District, in carrying out their efforts to achieve the goals, objectives and policies of the District, to consider and weigh all of the foregoing factors and other factors which bear upon the wisdom and fairness of District policies, programs, practices, procedures and decisions, with the view to accommodating, as far as they can be accommodated, all relevant and competing considerations, to the end, among others, of providing the maximum educational opportunity that can be made available to the individual students of the District, avoiding discrimination against any person by reason of race, color or ethnic identification, and striving to enhance racial integration among students, faculty and administrative staff of the District.

quirements of the fifth or fourteenth amendments to the Constitution, whichever is applicable, *and will continue to be in compliance with the requirements thereof* (emphasis added).

We assume that the Equal Educational Opportunities Act of 1974 is applicable to this case, *cf. United States v. Hinds County School Board*, 560 F.2d 619 (5th Cir. 1977), and is a valid exercise of congressional power. We have concluded the district court erred in finding the Board was likely to engage in new acts of discrimination. This holding undermines the basis for any argument that section 1718 requires retention of jurisdiction in this case.

The United States also argues that 20 U.S.C. § 1705 justifies retention of jurisdiction and continuing injunctive relief. The statute does contain an express congressional recognition that neighborhood school assignments should not be used to give effect to discriminatory strategic site selection. On the other hand, the Act also indicates that, absent a finding of illicit purpose on the part of a school board, student assignment on a neighborhood schools basis is to be encouraged, not condemned. *See* 20 U.S.C. §§ 1701(a)(1) & (2), 1705, 1707, 1713, 1714. This position is completely consistent with relevant Supreme Court doctrine. See p. ——, *supra*. If the school board at some future date adopts an assignment plan which violates section 1705, or which reinstates policies underlying discriminatory site selection, or which in any other respect is alleged to be the renewal of a purpose to segregate students on a prohibited basis, then a civil action can be commenced to correct the alleged violation, and upon a finding that a violation exists, a remedial decree would be entirely proper. Nothing in this opinion forecloses the possibility of such future action. To the extent the district court found, however, that if released from its jurisdiction the Board intended to adopt a neighborhood schools policy which would violate the mandates of section 1705, such a finding is clearly erroneous.

■ Plaintiffs suggest that even if the district court's regulatory injunction should be dissolved, a general prohibitory injunction requiring the Board not to engage in any new discriminatory acts is appropriate. Although some courts have entered such injunctions, *see, e. g., Lee v. Macon County Board of Education*, No. 70–251–S (N.D. Ala. Feb. 19, 1975), *quoted in* Note, *supra* at 228 n.167, we reject plaintiffs' suggestion.

Retention of jurisdiction when there is no longer a demonstrated need to monitor compliance may defeat important governmental and personal interests. Legitimate changes in educational policy are more difficult to implement. Where the court retains jurisdiction, a board may feel obliged to take racial factors into account in each of its decisions so that it can justify its actions to the supervising court. This may make it more, rather than less, difficult to determine whether race impermissibly influences board decisions, for the subject is injected artificially into the decision process, and the weight that racial considerations might otherwise have had is more difficult to determine.

Nothing said here is intended to suggest that any particular assignment plan for Pasadena is now to be preferred. That choice is one for the Board to make. There is no warrant for retaining further jurisdiction in the case, and the district court should enter an order relinquishing all further jurisdiction.

## On Petition for Rehearing and Rehearing en banc

Subsequent to the filing of both the opinion of the court and the concurring opinion of Judge Kennedy, and also subsequent to the filing of a petition for rehearing and suggestion for rehearing en banc by the United States, the Supreme Court issued its opinion in *Columbus Board of Education v. Penick*, —— U.S. ——, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979), and *Dayton Board of Education v. Brinkman*, —— U.S. ——, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979). We have studied the *Columbus* and *Dayton* decisions, and conclude that they do not require alteration of the opinions originally filed.

The various opinions of the Justices discussed several aspects of remedial principles in desegregation cases, but the holdings do not point to an approach or result different from that we reached in our initial disposition. The principal holding in both cases was that the school boards had operated a dual system as of 1954, the date of *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); given this fact, the school boards were then under an obligation to dismantle the dual systems. Neither board had taken such steps, and the Court therefore found court-supervised desegregation appropriate.

Since the issue in *Columbus* and *Dayton* was whether the school board had violated the constitution, it is not surprising that neither opinion addressed the crucial issue in this litigation: whether the effects of the Board's admitted constitutional violation have been corrected after nine years of a court-supervised remedy. In neither *Columbus* nor *Dayton* was the Court faced with a school system which had so operated under an assignment plan establishing a unitary system.

The panel has voted to deny the petition filed June 19, 1979, by the United States, and to reject the suggestion for en banc included therein. Judge Kennedy has amended his concurring opinion, by an order filed herewith. The full court has been advised of the suggestion for rehearing en banc and of the amendment to the concurring opinion. No judge of the court has requested en banc consideration. Fed.R. App.P. 35.

With the concurring opinion so amended, the petition for rehearing is denied and the suggestion for rehearing en banc is rejected.

